1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  TONY JOSE CARAPIA,              )   Civil No. 06cv0629 J(RBB)
                                    )
12              Petitioner,         )   REPORT AND RECOMMENDATION RE:
                                    )   DENIAL OF SECOND AMENDED
13  v.                              )   PETITION FOR WRIT OF HABEAS
                                    )   CORPUS [DOC. NO. 13]; ORDER
14  JOHN MARSHALL, Warden,          )   DENYING EVIDENTIARY HEARING
                                    )   AND APPOINTMENT OF COUNSEL
15              Respondent.         )   [DOC. NOS. 13, 20]
    _____)
16

17      Petitioner, Tony Jose Carapia, a state prisoner proceeding pro

18  se, filed a Second Amended Petition for Writ of Habeas Corpus [doc.

19  no. 13] pursuant to 28 U.S.C. § 2254 on September 27, 2006.  Carapia

20  claims he was denied due process when he received an enhanced

21  sentence that was not supported by sufficient evidence of specific

22  intent to benefit gang activity.  (Second Am. Pet. 6-9.)  After

23  reviewing the Petition, Respondent's Answer, the Lodgments, and

24  Petitioner's Traverse, this Court finds that Carapia is not entitled

25  to the relief requested and recommends that his Petition be denied

26  for the reasons outlined below.

27

28

                                    1

# I.

## FACTUAL BACKGROUND

Richard Goodman rented and lived in a house in San Diego County.  (Lodgment No. 1, Rep.'s Tr. vol. 7, 624-26, Feb. 14, 2002.) Although not a gang member, Goodman formed an "informal relationship" with Plucas, a member of the Westside Gang.  (Id. at 627-29.)  Goodman allowed Plucas to hang out at his house, and Plucas usually brought five to six other gang members with him. (Id. at 629-30.)  When Plucas was arrested, a gang member named "Monster" took over leadership of the gang and continued going to Goodman's house.  (Id. at 630.)

Monster was then arrested, so Hector Robles, nicknamed "Lazy Boy," took over control of the gang.  (Id. at 630-31.)  Goodman testified that at this time, the gang members became "unwanted" because Lazy Boy and his girlfriend began living at Goodman's house twenty-four hours a day.  (Id. at 631-32.)  Goodman asked Stephen Thomas, an acquaintance, to drop by the house to clear people out. (Id. at 509-11.)  Thomas helped Goodman clear his house on several occasions.  (Id. at 513-14.)

After Lazy Boy's arrest, Tony Carapia began hanging out at Goodman's house.  (Id. at 633-36.)  He appeared to take over leadership of the Westside Gang members who spent time there.  (Id. at 634; Lodgment No. 1, Rep.'s Tr. vol. 9, 999-1000, Feb. 21, 2002.) Carapia asserted authority over any drug sales that occurred in Goodman's house.  (Lodgment No. 1, Rep.'s Tr. vol. 7, 635-36.)

Stephen Thomas and his wife, Adrian, owned a cellular phone that Adrian sold to Goodman in exchange for money and drugs.  (Id. at 514-15, 652; Lodgment No. 1, Rep.'s Tr. vol. 8, 745-46, Feb. 20,

06cv0629 J(RBB)

2002.)  After the exchange, Goodman lent the phone to Carapia on a few occasions.  (Lodgment No. 1, Rep.'s Tr. vol. 7, 637.)

Adrian discovered that half of the phone's available minutes had been used when she tried to add another phone to the account. (Lodgment No. 1, Rep.'s Tr. vol. 8, 746.)  She called the cell phone and Carapia answered.  (<u>Id.</u> at 748.)  Adrian stated that she wanted her phone back; then Stephen Thomas took the phone and spoke to Petitioner.  (<u>Id.</u> at 749; Lodgment No. 1, Rep.'s Tr. vol. 7, 517.) Thomas told Carapia to return the phone, so he would pick it up. (<u>Id.</u>)  Joseph Carapia, Petitioner's cousin, drove Carapia to Goodman's house.  (<u>Id.</u> at 685-86.)

Stephen Thomas and his wife drove to Goodman's house to pick up the phone; Thomas had a flashlight, table leg, cane, and knife with him.  (<u>Id.</u> at 518, 520.)  When they arrived at the house, there were several Hispanic males in the living room.  (<u>Id.</u> at 521.)  Thomas walked into the bedroom to retrieve the phone, and Goodman asked him if he had come prepared.  (<u>Id.</u> at 522.)  Thomas replied, "I am always prepared."  (<u>Id.</u>)

When Thomas walked back into the living room, Carapia confronted him stating, "You said we have a problem."  (<u>Id.</u> at 523-24.)  Thomas replied that the problem had been solved because he had his property back.  (<u>Id.</u> at 524.)  Petitioner then claimed that everything in the house belonged to him.  (<u>Id.</u> at 525.)  Thomas said the phone did not belong to Carapia.  (<u>Id.</u>)

According to Thomas, Petitioner then "flinched" at him in an aggressive way.  (<u>Id.</u>)  Thomas was holding a flashlight, but he dropped it when he thought that he and Carapia would fight because Thomas did not want to hit him with it.  (<u>Id.</u> at 526.)  The two men

3

1  "ran into each other." (<u>Id.</u>)  During the fight, Carapia stabbed

2  Thomas.  (<u>Id.</u> at 527-28.)  Stephen Thomas sustained two stab wounds

3  to his chest and five on his arm and left side.  (<u>Id.</u> at 616-17.)

4  Thomas had a knife in his pocket but never used it, claiming he did

5  not remember it was there.  (<u>Id.</u> at 530.)

6      Right before the fight broke out, Adrian ran to the car and

7  grabbed the table leg and another flashlight.  (Lodgment No. 1,

8  Rep.'s Tr. vol. 8, 761-62.)  She held the table leg behind her back

9  until the fight started, looking for a sign from her husband about

10  what he wanted her to do.  (<u>Id.</u> at 762, 810-11.)  During the fight,

11  Salcido, another gang member with the nickname "Smokey," pulled the

12  table leg out of her hands and ran away.  (<u>Id.</u> at 764.)

13      At trial, Petitioner claimed that Stephen Thomas was the

14  aggressor and charged at him first.  (Lodgment No. 1, Rep.'s Tr.

15  vol. 9, 1047.)  Three other witnesses stated that Thomas charged

16  first.  (Lodgment No. 1, Rep.'s Tr. vol. 7, 662, 688-89; Lodgment

17  No. 1, Rep.'s Tr. vol. 8, 806, 815, 818.)  Petitioner also testified

18  that he did not stab Stephen Thomas.  (Lodgment No. 1, Rep.'s Tr.

19  vol. 9, 1051.)

20      Detective Luis Rudisell testified as the prosecution's expert

21  witness.  (Lodgment No. 1, Rep.'s Tr. vol. 8, 896.)  Detective

22  Rudisell described the Westside Gang as an association of

23  approximately 135 to 150 Hispanic males, primarily between the ages

24  of twelve and twenty-two.  (<u>Id.</u> at 905; Lodgment No. 1, Rep.'s Tr.

25  vol. 9, 967.)  He also stated that the gang's primary activity since

26  the late 1990s involved trafficking and selling methamphetamine and

27  other drugs.  (Lodgment No. 1, Rep.'s Tr. vol. 8, 905.)

28

At trial, the prosecution presented evidence of Carapia's membership in the Westside Gang, including his admissions, arrests with other Westside Gang members, and Petitioner's tattoos. (Lodgment No. 1, Rep.'s Tr. vol. 8, 909-10, 912; Lodgment No. 1, Rep.'s Tr. vol. 9, 961-62, 971-72.)  The prosecution also presented photos of Petitioner making gang signs with his hands.  (Lodgment No. 1, Rep.'s Tr. vol. 8, 913.)  Detective Rudisell identified Carapia's tattoos as a Westside Gang tattoo, a tattoo representing old Escondido, theater faces standing for "smile now, cry later," and prison bars with a clock, representing time served in prison. (Lodgment No. 1, Rep.'s Tr. vol. 9, 971-72.)  All of the tattoos are associated with gang culture.  (<u>Id.</u>)  Petitioner denied membership in the Westside Gang, but Detective Rudisell testified that at the time of the incident, Carapia was the leader, or "shot caller," for the Westside Gang members who spent time at Goodman's house.  (<u>Id.</u> at 998-1000, 1027.)

Detective Rudisell further testified that a stabbing crime would benefit the Westside Gang's reputation.  (<u>Id.</u> at 973-74, 979-80.)  Gangs often resort to violence and intimidation to protect their turf because the perception of being tough reduces the likelihood of challenges from rival gangs.  (<u>Id.</u> at 969.)  The crime would also benefit the gang's narcotic sales by eliminating competition in the area.  (<u>Id.</u> at 980.)  Stabbing and threatening witnesses would be consistent with an intent to promote the gang. (<u>Id.</u> at 981.)

06cv0629 J(RBB)

**II.**

**PROCEDURAL BACKGROUND**

In count one of an amended information, the State charged Petitioner with attempted murder in violation of California Penal Code section 664 and section 187(a).  (Lodgment No. 4, Pet. for Review 3, <u>People v. Carapia</u>, No. S131307 (Cal. Mar. 30, 2005).) Count one further alleged Carapia used a dangerous and deadly weapon in violation of California Penal Code section 12022(b)(1).  (<u>Id.</u>) Count two charged Petitioner with assault with a deadly weapon with force likely to cause great bodily injury in violation of California Penal Code section 245(a)(1).  (<u>Id.</u> at 3-4.)  It also alleged that he personally inflicted great bodily injury upon the victim in violation of California Penal Code section 12022.7(a).  (<u>Id.</u>)  Both counts alleged that the offenses were committed for the benefit of a criminal street gang in violation of California Penal Code section 186.22(b)(1).  (<u>Id.</u> at 4.)  The information also included an allegation of a prison prior.  (<u>Id.</u>)

Petitioner moved to bifurcate the trial on counts one and two from the trial on the gang enhancement and the prison prior.  (<u>Id.</u> at 4.)  The court denied the motion to bifurcate the gang allegations but granted the motion to bifurcate the prison prior allegation.  (<u>Id.</u>)

The case proceeded to trial in the superior court on February 11, 2002.  (Lodgment No. 2, Appellant's Opening Br. 2, <u>People v. Carapia</u>, No. D042110 (Cal. Ct. App. Dec. 28, 2004).)  A jury found Carapia guilty of all counts, including the allegation that Petitioner committed these crimes for the benefit of a criminal street gang.  (<u>Id.</u> at 2.)  After a bench trial, the judge found the

1  prior conviction allegation was true as alleged in the information.
2  (Id.)

3      On July 26, 2002, the trial court sentenced Petitioner to
4  twenty-four years in prison. (Id. at 2; Lodgment No. 3, People v.
5  Carapia, No. D042110, slip op. at 6 (Cal. Ct. App. Dec. 28, 2004).)
6  The sentence consisted of nine years for the attempted murder
7  conviction and consecutive terms of three years for the great bodily
8  injury enhancement, one year for the deadly weapon enhancement, ten
9  years for the criminal street gang enhancement, and one year for the
10 prior prison term enhancement. (Id.)  The court stayed imposition
11 of the sentence on count two, the assault count, and appended
12 enhancements under section 654. (Id.)

13     On May 12, 1002, Carapia sought leave to file a late notice of
14 appeal. (Lodgment No. 2, Appellant's Opening Br. 3, People v.
15 Carapia, No. D042110.)  The California Court of Appeal granted the
16 application. (Id.)  Petitioner then filed his notice of appeal on
17 May 27, 2003. (Id.)

18     Carapia raised two issues on appeal. First, he argued that
19 insufficient evidence existed to support the finding that the crimes
20 benefitted a criminal street gang. (Lodgment No. 3, People v.
21 Carapia, No. D042110, slip op. at 2.)  Second, Petitioner contended
22 that the trial court prejudicially erred by denying his motion to
23 bifurcate the gang allegations from the trial on the underlying
24 offenses. (Id.)  The court of appeal requested supplemental
25 briefing on a third issue:  whether Petitioner was entitled to a
26 jury determination of the aggravating factors relied upon for the
27 upper-term sentence under Blakely v Washington, 542 U.S. 296 (2004).
28 (Id.)

7

The California Court of Appeal affirmed Carapia's conviction, finding sufficient evidence to support the gang enhancement and no error in the trial court's ruling on the bifurcation motion.  (<u>Id.</u> at 15.)  The appellate court reversed and remanded for resentencing because it found the judge's determination of the aggravating factors was contrary to <u>Blakely</u>.[1]  (<u>Id.</u>)

Justice McDonald concurred with the majority on the sentencing issue but dissented from the majority opinion regarding the sufficiency of the evidence to support the gang enhancement.  (<u>Id.</u> at 1 (McDonald, J., concurring and dissenting).)  Justice McDonald determined that the denial of a bifurcated trial was not prejudicial error.  (<u>Id.</u>)

Carapia filed a Petition for Review in the California Supreme Court raising the same two issues originally raised on appeal. (Lodgment No. 4, Pet. for Review 2, <u>People v. Carapia</u>, No. S131307.) The court denied the petition on March 30, 2005.  (Lodgment No. 5, <u>People v. Carapia</u>, No. S131307, slip op. at 1 (Cal. Mar. 30, 2005).)

On March 22, 2006, Carapia filed a Petition for Writ of Habeas Corpus with this Court [doc. no. 1].  United States District Judge Napoleon A. Jones dismissed the Petition without prejudice for failure to comply with local rules, allege exhaustion of state court remedies, state a claim, and name the proper respondent [doc. no. 5].

Carapia then filed a First Amended Petition for Writ of Habeas Corpus and Petition to Proceed In Forma Pauperis on July 10, 2006 [doc. nos. 8, 9].  Concurrently, Petitioner requested an extension

---

[1]   In connection with his resentencing, Carapia unsuccessfully sought collateral review of other issues not relevant to the claim asserted here.  (Second Am. Pet. 3-5.)

1  of time and a stay and abeyance [doc. nos. 10, 11].  On August 23,

2  2006, Judge Jones granted the Petition to Proceed In Forma Pauperis,

3  but he dismissed the Petition without prejudice and denied the other

4  motions [doc. no. 12].

5      On September 27, 2006, Carapia filed his Second Amended

6  Petition for Writ of Habeas Corpus [doc. no. 13].  Respondent filed

7  an Answer with accompanying Memorandum of Points and Authorities and

8  a Notice of Lodgment on December 27, 2007 [doc. no. 18].  Petitioner

9  submitted a Traverse, which was filed nunc pro tunc to January 31,

10 2007 [doc. nos. 19, 20].

11                              **III.**

12                        **STANDARD OF REVIEW**

13     The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28

14 U.S.C.A. § 2244 (West 2006), applies to all federal habeas petitions

15 filed after April 24, 1996.  Woodford v. Garceau, 538 U.S. 202, 204

16 (2003) (citing Lindh v. Murphy, 521 U.S. 320, 326 (1997)).  AEDPA

17 sets forth the scope of review for federal habeas corpus claims:

18          The Supreme Court, a Justice thereof, a circuit
            judge, or a district court shall entertain an application
19          for a writ of habeas corpus in behalf of a person in
            custody pursuant to the judgment of a State court only on
20          the ground that he is in custody in violation of the
            Constitution or laws or treaties of the United States.

21

22 28 U.S.C.A. § 2254(a) (West 2006); see also Reed v. Farley, 512 U.S.

23 339, 347 (1994); Hernandez v. Ylst, 930 F.2d 714, 719 (9th Cir.

24 1991).  Because Carapia filed his Petition on March 22, 2006, AEDPA

25 applies to this case.  See Woodford, 538 U.S. at 204.

26     In 1996, Congress "worked substantial changes to the law of

27 habeas corpus." Moore v. Calderon, 108 F.3d 261, 263 (9th Cir.

28 1997).  Amended § 2254(d) now reads:

                              9

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

To present a cognizable federal habeas corpus claim, a state prisoner must allege that his conviction was obtained "in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C.A. § 2254(a) (West 2006).  Petitioner must allege that the state court violated his federal constitutional rights. See Reed, 512 U.S. at 347; Hernandez, 930 F.2d at 719; Jackson v. Ylst, 921 F.2d 882, 885 (9th Cir. 1990).

A federal district court does "not sit as a 'super' state supreme court" with general supervisory authority over the proper application of state law. Smith v. McCotter, 786 F.2d 697, 700 (5th Cir. 1986); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (holding that federal habeas courts must respect a state court's application of state law); Jackson, 921 F.2d at 885 (concluding that federal courts have no authority to review a state's application of its law).  Federal courts may grant habeas relief only to correct errors of federal constitutional magnitude. Oxborrow v. Eikenberry, 877 F.2d 1395, 1400 (9th Cir. 1989) (stating that federal courts are not concerned with errors of state law unless they rise to the level of a constitutional violation).

The Supreme Court, in <u>Lockyer v. Andrade</u>, 538 U.S. 63 (2003), stated that "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) -- whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law." <u>Id.</u> at 71 (citation omitted).  In other words, a federal court is not required to review the state court decision <u>de</u> <u>novo</u>. <u>Id.</u>  Rather, a federal court can proceed directly to the reasonableness analysis under § 2254(d)(1).  <u>Id.</u>

The "novelty" in § 2254(d)(1) is "the reference to 'Federal law, <u>as determined by the Supreme Court of the United States</u>.'" <u>Lindh v. Murphy</u>, 96 F.3d 856, 869 (7th Cir. 1996) (en banc), <u>rev'd on other grounds</u>, 521 U.S. 320 (1997) (emphasis added).  Section 2254(d)(1) "explicitly identifies only the Supreme Court as the font of 'clearly established' rules."  <u>Id.</u>  "[A] state court decision may not be overturned on habeas corpus review, for example, because of a conflict with Ninth Circuit-based law."  <u>Moore</u>, 108 F.3d at 264. "[A] writ may issue only when the state court decision is 'contrary to, or involved an unreasonable application of,' an authoritative decision of the Supreme Court."  <u>Id.</u>; <u>see also</u> <u>Baylor v. Estelle</u>, 94 F.3d 1321, 1325 (9th Cir. 1996); <u>Childress v. Johnson</u>, 103 F.3d 1221, 1225 (5th Cir. 1997); <u>Devin v. DeTella</u>, 101 F.3d 1206, 1208 (7th Cir. 1996).

Furthermore, with respect to the factual findings of the trial court, AEDPA provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of

11

1    rebutting the presumption of correctness by clear and
     convincing evidence.

2

3  28 U.S.C.A. § 2254(e)(1) (West 2006).

4                              **IV.**

5                          **DISCUSSION**

6       Petitioner asserts that the trial court violated his Fourteenth

7  Amendment right to due process by imposing a gang enhancement based

8  upon insufficient evidence. (Second Am. Pet. 6.)  He specifically

9  claims there was insufficient evidence to prove "the charged crimes

10 were committed for the <u>benefit</u> of, at the <u>direction</u> of, or in

11 <u>association</u> with the Westside gang . . . ." (<u>Id.</u> at 7.)  Carapia

12 also maintains there was insufficient evidence to show the specific

13 intent "to promote, further, or assist in criminal conduct by gang

14 members . . . ." (<u>Id.</u> (quoting Cal. Penal Code § 186.22(b)(1)).)

15 Respondent argues the state court's decision to deny Petitioner's

16 claim on the merits was reasonable and not contrary to United States

17 Supreme Court precedent. (Mem. P. & A. Supp. Answer 5.)

18       In deciding a section 2254 habeas petition, this Court reviews

19 the "last reasoned" state court decision. <u>Medina v. Hornung</u>, 386

20 F.3d 872, 877 (9th Cir. 2004).  The California Supreme Court

21 summarily denied Carapia's petition for review. (Lodgment No. 5,

22 <u>People v. Carapia</u>, No. S131307, slip op. at 1.)  Therefore, this

23 Court "looks through" that dismissal to the California Court of

24 Appeal's decision on Petitioner's direct appeal.  <u>Medina</u>, 386 F.3d

25 at 877.

26       Under AEDPA, a writ for federal habeas relief shall not be

27 granted unless the state court's decision "was contrary to, or

28 involved an unreasonable application of" Supreme Court precedent or

                              12

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2) (West 2006).

> [A] state court decision is 'contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from . . . precedent.'

Lockyer, 538 U.S. at 73 (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)) (citing Bell v. Cone, 535 U.S. 685, 694 (2002)).  A state court unreasonably applies federal law if its application is "objectively unreasonable," which is "more than [being] incorrect or erroneous."  Id. at 75.

The Fourteenth Amendment due process clause requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which . . . [a defendant] is charged."  In re Winship, 397 U.S. 358, 364 (1970).  When reviewing a claim for sufficiency of the evidence, the standard established by Supreme Court precedent is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); see also People v. Johnson,  26 Cal. 3d 557, 576, 606 P.2d 738, 750, 162 Cal. Rptr. 431, 443 (1980).  The California Court of Appeal applied this standard in its evaluation of Carapia's claim.  (See Lodgment No. 3, People v. Carapia, No. D042110, slip op. at 7.)

"Our task under AEDPA, then, is to determine whether the decision of the California Court of Appeal, holding that the

1  evidence was sufficient to convict [Carapia], was an unreasonable

2  application of <u>Jackson</u>."  <u>Smith v. Mitchell</u>, 437 F.3d 884, 889

3  (citing 28 U.S.C. § 2254(d); <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274-

4  75 (9th Cir. 2005)).  "The <u>Jackson</u> inquiry does not focus on whether

5  the trier of fact made the <u>correct</u> guilt or innocence determination,

6  but rather whether it made a <u>rational</u> decision to convict or

7  acquit."  <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993).

8      To determine whether the state court's application of <u>Jackson</u>

9  was unreasonable, the Court must look to state law to define the

10  substantive elements of the crime necessary to support a conviction.

11  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Panther v. Hames</u>, 991 F.2d 576, 581

12  (9th Cir. 1993).

13      California Penal Code section 186.22(b)(1) provides that "any

14  person who is convicted of a felony committed for the benefit of, at

15  the direction of, or in association with any criminal street gang,

16  with the specific intent to promote, further, or assist in any

17  criminal conduct by gang members, shall, upon conviction of that

18  felony . . . be punished by an additional term of 10 years."  Cal.

19  Penal Code § 186.22(b)(1)(C) (West Supp. 2007).  According to the

20  statute, the prosecution must prove two elements:  (1) The defendant

21  committed the crime for the benefit of, at the direction of, or in

22  association with a criminal street gang; and (2) the defendant

23  intended to assist, further, or promote criminal conduct by gang

24  members.  <u>People v. Gardeley</u>, 14 Cal. 4th 605, 615-16, 927 P.2d 713,

25  720, 59 Cal. Rptr. 2d 356, 363 (1996); <u>see also</u> <u>Garcia v. Carey</u>, 395

26  F.3d 1099, 1103 (9th Cir. 2005).  Carapia alleges the prosecution

27  lacked sufficient evidence to prove either element.  (Second Am.

28  Pet. 7-8.)

14

**A.    For the benefit of, at the direction of, or in association
with a criminal street gang**

California Penal Code section 186.22(b)(1) first requires that
the defendant commit the crime "for the benefit of, at the direction
of, or in association with a criminal street gang."  Cal. Penal Code
§ 186.22(b)(1).  To prove this element, the prosecution must
establish the existence of a "criminal street gang."  See Gardeley,
14 Cal. 4th at 616, 927 P.2d at 720, 59 Cal. Rptr. 2d at 363.  The
prosecution must also prove that the defendant committed the crime
"for the benefit of, at the direction of, or in association with"
that gang.  Cal. Penal Code § 186.22(b)(1).

**1.   Criminal Street Gang**

Carapia does not dispute that he was a Westside Gang member.
(Second Am. Pet. 7.)  At trial, the prosecution introduced evidence
to satisfy the statutory definition of a "criminal street gang."

California Penal Code section 186.22(f) defines a "criminal
street gang" as "any ongoing association of three or more persons
that shares a common name or common identifying sign or symbol; has
as one of its 'primary activities' the commission of specified
criminal offenses; and engages through its members in a 'pattern of
criminal gang activity.'"  Gardeley, 14 Cal. 4th at 610, 927 P.2d at
715, 59 Cal. Rptr. 2d at 358 (summarizing Cal. Penal Code §
186.22(f)).

At Petitioner's trial, the prosecution relied heavily upon
Detective Rudisell's testimony to prove the elements of the gang
enhancement.  (Lodgment No. 1, Rep.'s Tr. vol. 8, 896.)  The
detective described the Westside Gang as an association of
approximately 135 to 150 Hispanic males, primarily between the ages

15

1  of twelve to twenty-two.  (<u>Id.</u> at 905; Lodgment No. 1, Rep.'s Tr.

2  vol. 9, 967.)  The Westside Gang's common signs and symbols include

3  graffiti, tattoos, and hand signs.  (Lodgment No. 1, Rep.'s Tr. vol.

4  9, 970-72; Lodgment No. 1, Rep.'s Tr. vol. 8, 913-14.)  Evidence at

5  trial also established that the Westside Gang's primary activity

6  since the late 1990s involved trafficking and selling

7  methamphetamine and other drugs.  (Lodgment No. 1, Rep.'s Tr. vol.

8  8, 905.)

9      <u>In re Nathaniel</u>, 228 Cal. App. 3d 990, 279 Cal. Rptr. 2d 236

10  (Ct. App. 1991), is among the cases Petitioner cites to support his

11  argument for the invalidity of the gang enhancement.  (Traverse Ex.

12  D.)  In <u>Nathaniel</u>, the court reversed a gang enhancement because the

13  expert failed to establish a criminal primary activity of the gang

14  as listed in California Penal Code § 186.22(f).  <u>Id.</u> at 1004, 279

15  Cal. Rptr. at 246.  Carapia's trial differed from <u>In Re Nathaniel</u>

16  because Detective Rudisell did specify that the Westside Gang's

17  primary activity was selling methamphetamine and other drugs.  After

18  listening to the evidence presented at trial, a reasonable trier of

19  fact could have concluded that the Westside Gang was a criminal

20  street gang as defined by California Penal Code section 186.22(f).

21  Carapia's argument that the Goodman house was not a drug

22  "stronghold" (Traverse 10-11) does not change this result.

23      **2.   Benefit, Direction, or Association**

24      Carapia asserts that the evidence presented at trial was

25  insufficient as a matter of law to prove the crimes were committed

26  for the benefit of, or in association with, a criminal street gang.

27  (Second Am. Pet. 7.)  In Petitioner's Traverse, he claims that

28  Detective Rudisell's general statements about the benefit to the

gang referred to the "after effects" of the crime and failed to explain how the stabbing incident itself was gang-related. (Traverse 7.) According to Carapia, "there was no evidence presented to the jury that petitioner Carapia, or the Westside gang's reputation, was somehow 'enhanced,'" aside from the expert's testimony that the gang would gain respect from the crime. (Second Am. Pet. 8.)

Carapia also argues there was insufficient evidence to prove he committed the offense in "association with" a criminal street gang. (Traverse 5-7.) This version of Petitioner's claim was not specifically raised on appeal. (See Lodgment No. 2, Appellant's Opening Br. 19-22, People v. Carapia, No. D042110; Appellant's Reply Brief 1-2, People v. Carapia, No. D042110.) Technically, a claim raised for the first time in a Traverse is unexhausted and cannot serve as a basis for habeas corpus relief. 28 U.S.C.A. § 2254(b)(1)(A) (West 2006). To properly exhaust a claim it must be fairly presented to the state's highest court. O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999). A petitioner should describe the operative facts and his legal theory with sufficient detail that the state court has a "'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982).

The evidence supporting a finding that Carapia acted in association with a criminal street gang overlaps evidence that he acted for the benefit of a criminal street gang. Consequently, this subclaim was fairly presented to, and resolved by, the California courts. In any event, a felony committed "for the benefit of, at

17

the direction of, or in association with" any criminal street gang are alternatives; any one is sufficient to support the conviction.

Petitioner contends that although there were gang members in Goodman's house when the stabbing occurred, the prosecution failed to introduce evidence that Carapia shared a common interest with them, particularly since he did not shout gang slogans or refer to the Westside Gang during the incident. (<u>Id.</u>; Second Am. Pet. 8.)

In <u>People v. Romero</u>, the defendant made a similar argument, alleging that because the victims were not gang members and the aggressors did not wear gang colors or use gang slogans, the expert's testimony about gang culture was insufficient to support the gang enhancement. <u>People v. Romero</u>, 140 Cal. App. 4th 15, 18, 43 Cal. Rptr. 3d 862, 864 (Ct. App. 2006). The expert testified about gang rivalries and territories, and he opined that a shooting of any African-American man in the area would elevate the status of the shooters and the entire gang. <u>Id.</u> at 19, 43 Cal. Rptr. 3d at 865. The court found that the expert's testimony supported the opinion that the shooting was done for the benefit of, or in association with, the gang. <u>Id.</u>

Similarly, Detective Rudisell testified that a violent crime, such as a stabbing, benefits the gang's reputation for being tough and discourages other people from challenging the gang. (Lodgment No. 1, Rep.'s Tr. vol. 9, 979-81.) Goodman's house, where the stabbing occurred, was on the edge of Westside's territory. (<u>Id.</u> at 968, 970.) The Westside Gang marked Goodman's house with graffiti to identify it as the gang's turf. (<u>Id.</u> at 969.) Rudisell explained that gangs often resort to violence and intimidation to protect their turf because the perception of being

18

tough reduces the likelihood of challenges from rival gangs.  (<u>Id.</u> at 969.)  Being tough and violent also increases respect, which in turn aids the gang in recruiting new members.  (<u>Id.</u> at 973-74.) The stabbing would also benefit the gang's narcotic sales by eliminating competition in the area.  (<u>Id.</u> at 980.)

Evidence at trial indicated that Petitioner associated with the Westside Gang and claimed gang membership at the time of the incident.  Detective Rudisell described two criteria that identified Petitioner as a Westside Gang member prior to the stabbing.  First, Petitioner claimed gang membership at a classification interview, and second, he committed a crime while claiming to be a member of the Westside Gang.  (Lodgment No. 1, Rep.'s Tr. vol. 8, 910-11; Lodgment No. 1, Rep.'s Tr. vol. 9, 985-86.)

Detective Rudisell also identified and explained four tattoos on Petitioner that indicated membership.  (Lodgment No. 1, Rep.'s Tr. vol. 9, 971-72.)  Although Petitioner attempts to present alternative explanations for one of those tattoos, (<u>see</u> Traverse 11, Ex. C (referring to the theater faces tattoo)), he fails to explain away the other three.  Further, Carapia admits in his Petition that the evidence supports a finding that he was a gang member.  (Second Am. Pet. 7.)

Relying on the testimony and evidence presented at trial, the California Court of Appeal reasoned that "while the jury could have concluded the stabbing was simply the result of a dispute over a cell phone unrelated to any gang activity, it was not required to do so." (Lodgment No. 3, <u>People v. Carapia</u>, No. D042110, slip op. at 8.)  A jury could reasonably conclude that the violent

confrontation was gang-related and committed to "enhance the reputation of Carapia and the Westside gang." (Id.)  The appellate court applied the Jackson standard and correctly found that a rational trier of fact could have found that Petitioner committed the stabbing for the benefit of, or in association with, the Westside Gang.

**B.   Specific Intent**

The prosecution must prove that the defendant specifically intended to assist, further, or promote criminal conduct by gang members.  Cal. Penal Code § 186.22(b)(1).  Petitioner strongly disputes the sufficiency of the evidence to prove this element. (See Second Am. Pet. 7-8.)  Carapia claims that the gang enhancement is unsupported by the evidence because he did not throw hand signs, shout gang slogans, or refer to the Westside Gang during the incident.  (Second Am. Pet. 8.)  He also argues that if he had specific intent before the crime to promote the gang, he would have asked for assistance or prepared for the fight. (Traverse 7-8.)

The California Court of Appeal described the event preceding the stabbing as follows:

> The actual transfer of the cell phone occurred without incident; Carapia, as agreed returned the phone to Goodman who, in turn, gave it to Stephen.  Only after the phone had been transferred, did Carapia confront Stephen about the "problem."  Carapia was offended when Stephen stated only Goodman could use the phone.  Carapia felt this statement was disrespectful, taunting, and made him appear to be a fool in front of the others.  It was at this point that Carapia claimed that everything in the house belonged to him and advanced toward Stephen in a menacing manner.

(Lodgment No. 3, People v. Carapia, No. D042110, slip op. at 8.) The appellate court highlighted Detective Rudisell's testimony

1    about respect and reputation to support the jury's finding of true

2    for the gang enhancement.  (Id.)  Petitioner discounts Rudisell's

3    testimony about disrespect.  (See Traverse 8.)  Nevertheless, the

4    majority determined that a jury could reasonably believe Carapia

5    stabbed Stephen Thomas with intent to enhance the gang's reputation

6    as a violent gang that would not tolerate any form of disrespect.

7    (Id. at 8-9.)

8         Justice McDonald disagreed.  He concluded that despite

9    Detective Rudisell's testimony, nothing in the record indicated

10   that Carapia stabbed Thomas, a non-gang member, with specific

11   intent to benefit the Westside Gang or to promote criminal conduct

12   by the gang's members.  (Id. at 5 (McDonald, J., concurring and

13   dissenting).)[2]  Justice McDonald wrote that under the majority's

14   analysis, "it is difficult to imagine a crime committed by a gang

15   member that . . . would not be committed with specific intent to

16   benefit the gang."  (Id. at 6.)  The majority "thereby converts a

17   sentence enhancement into the basic penalty for the underlying

18   offense."  (Id.)

19        The sufficiency of the evidence to support a gang enhancement

20   is a recurring issue.  In Garcia v. Carey, 395 F.3d 1099, 1103 (9th

21   Cir. 2005), the Ninth Circuit affirmed a grant of habeas corpus

22   relief on the gang enhancement where the prosecution failed to

23

24        [2]  In his Traverse, Carapia requests this Court take judicial
     notice of Justice McDonald's dissenting opinion.  (Traverse 3.)
25   Federal Rule of Evidence 201 allows a court to take judicial notice
     of "adjudicative facts which are not subject to reasonable dispute
26   because they are generally known or 'capable of accurate and ready
     determination by resort to sources whose accuracy cannot reasonably
27   be questioned.'"  Korematsu v. United States, 584 F. Supp. 1406,
     1414 (9th Cir. 1984) (citing Fed. R. Evid. 201(b)(2)).  Since the
28   appellate opinion is an interpretation of the facts and law, it is
     not an adjudicative fact.  Petitioner's request is DENIED.

21

present evidence that the defendant committed the underlying crime

(robbery) with specific intent to promote or further other gang-

related activity.   The gang expert testified that Garcia was a gang

member; the robbery was committed on gang turf; and the gang was

"turf-oriented."   Id. at 1104.

> Detective Hernandez [the gang expert] did not offer any
> testimony, however, on what was meant by being "turf-
> oriented," what implications arose from a gang being
> "turf-oriented," or how the gang's turf-oriented nature
> could support the conclusion that this robbery was
> committed with the specific intent to promote, further,
> or assist other gang related criminal activity.

Id.   The court focused on the absence of evidence linking the

underlying offense with furthering other criminal activity.

Some California courts reject Garcia v. Carey, finding that

specific intent "does not require intent to further criminal

conduct beyond the charged crime."   People v. Romero, 140 Cal. App.

4th at 19, 43 Cal. Rptr. 3d at 865 ("By its plain language, the

statute requires a showing of specific intent to promote, further,

or assist in 'any criminal conduct by gang members,' rather than

other criminal conduct."); see also People v. Hill, 142 Cal. App.

4th 770, 774, 47 Cal. Rptr. 3d 875, 877 (Ct. App. 2006) ("We agree

with Romero."). But see In re Frank S., 141 Cal. App. 4th 1192,

1199, 46 Cal. Rptr. 3d 839, 844 (Ct. App. 2006) (reversing the gang

enhancement where "nothing besides weak inferences and

hypotheticals show the minor had a gang-related purpose for the

knife[]").   Generally, this Court must defer to the state court's

interpretation of California statutes.   Oxborrow v. Eikenberry, 877

F.2d 1395, 1399 (9th Cir. 1989).

California state law permits juries to rely on expert

testimony about gang culture and habits when reaching a verdict on

22

a gang-related offense or a gang allegation.  *People v. Ferraez*,
112 Cal. App. 4th 925, 930, 5 Cal. Rptr. 3d 640, 645 (Ct. App.
2003).  Experts, however, cannot testify that an individual
possessed subjective knowledge and a specific intent.  *In re Frank*
*S.*, 141 Cal. App. 4th at 1197, 46 Cal. Rptr. 3d at 842 (citing
*People v. Killebrew*, 103 Cal. App. 4th 644, 657-58, 126 Cal. Rptr.
2d 876, 885-86 (Ct. App. 2002)).

In *People v. Gardeley*, 14 Cal. 4th 605, 927 P.2d 713, 59 Cal.
Rptr. 2d 356, the California Supreme Court upheld a gang
enhancement where gang members assaulted and robbed a non-gang
member who was on their turf.  *Id.* at 610-11, 619, 927 P.2d at 716,
722, 59 Cal. Rptr. 2d at 359-60, 365.  In response to a
hypothetical, a gang expert testified that an assault of that type
"was a 'classic' example of gang-related activity, explaining that
criminal street gangs rely on such violent assaults to frighten the
residents of an area where gang members sell drugs, thereby
securing the gang's drug-dealing stronghold."  *Id.* at 619, 927 P.2d
at 722, 59 Cal. Rptr. 2d at 365.

An appellate court also found sufficient evidence to support
a gang enhancement in *People v. Hill*, 142 Cal. App. 4th 770, 47
Cal. Rptr. 3d 875.  There, the defendant threatened to shoot a
woman after she "disrespected" him.  *Id.* at 772, 47 Cal. Rptr. 3d
at 876.  The expert testified that it is important for a gang
member to take action when he feels "disrespected," and the
defendant's threat benefitted the gang by proving that
disrespecting a gang member would have consequences.  *Id.* at 772-
73, 47 Cal. Rptr. 3d at 876; *see also People v. Augborne*, 104 Cal.
App. 4th 362, 372-73, 128 Cal. Rptr. 2d 258, 265 (Ct. App. 2002)

1  (stating that expert testimony provided sufficient evidence that

2  criminal threats were intended to promote gang activities).

3      The California Court of Appeal acknowledged that "specific

4  intent requires a subjective desire to benefit the gang in

5  committing the offense." (Lodgment No. 3, <u>People v. Carapia</u>, No.

6  D042110, slip op. at 7.)  The prosecutor sought an opinion from his

7  gang expert on the ultimate issue.  In response to a hypothetical,

8  Detective Rudisell testified that he believed the stabbing

9  described in the hypothetical was done "for the sole purpose of

10  establishing a reputation with the gang to let everybody else know

11  that, 'this is what we are about.  Don't mess with the Westside.

12  This is what we do to people." (Lodgment No. 1, Rep.'s Tr. vol. 9,

13  981.)  Arguably, this testimony goes to Carapia's "subjective

14  knowledge and intent," an improper opinion on the ultimate issue.

15  <u>See</u> <u>In re Frank S.</u>, 141 Cal. App. 4th at 1197-99, 46 Cal. Rptr. 3d

16  at 843-44.  Nevertheless, there was other evidence to support the

17  gang enhancement.

18      The testimony in Carapia's case closely resembles the evidence

19  presented in <u>People v. Gardeley</u>.  Detective Rudisell explained that

20  the gang culture thrived on respect and that members received more

21  respect when they committed violent crimes.  (Lodgment No. 1,

22  Rep.'s Tr. vol. 9, 973-74.)  Violence and intimidation reduces

23  challenges from rival gangs.  (<u>Id.</u> at 969.)  Above all, a

24  reputation for violence prevents others from coming into the

25  neighborhood to establish a drug trade and gives the Westside Gang

26  a monopoly on the narcotic sales in the area.  (<u>Id.</u> at 980.)

27  Testimony at trial indicated that Carapia sold drugs at Goodman's

28

1   house and expected all sales and proceeds to be his.  (Lodgment No.
2   1, Rep.'s Tr. vol. 7, 635-36.)

3       Just as the experts in <u>Gardeley</u> and <u>Hill</u> testified about
4   reputation and respect, Detective Rudisell testified that a
5   stabbing increased Carapia's respect, which in turn increased the
6   Westside Gang's reputation.  (Lodgment No. 1, Rep.'s Tr. vol. 9,
7   973-74, 980.)  Based on his testimony, a rational jury could
8   conclude that the evidence at Petitioner's trial supports a finding
9   that violent crimes increase the Westside Gang's control over drug
10  sales in the area.  The increased drug sales satisfy the
11  requirement of proving intent to further or promote criminal gang
12  activity.  Therefore, the testimony and evidence presented at trial
13  was sufficient to support a reasonable inference that Carapia
14  stabbed Stephen Thomas to increase his and the Westside Gang's
15  reputation, which secures the gang's future narcotic sales.

16      A rational jury could conclude that Petitioner had the
17  specific intent to benefit the gang.  Accordingly, the decision of
18  the California Court of Appeal does not involve an unreasonable
19  application of <u>Jackson</u>.  Petitioner's claim for habeas relief
20  should be **DENIED**.

21  **C.   <u>Petitioner Is Not Entitled to an Evidentiary Hearing.</u>**

22      In his Traverse, Carapia requests an evidentiary hearing to
23  prove his actual innocence.  (Traverse 2.)  This request may merely
24  have been made in response to Respondent's assertion that
25  Petitioner "is not entitled to an evidentiary hearing because he
26  relies on the same facts as he did in the state courts."  (Answer
27  2; <u>see</u> Traverse 2.)

28

                                    25
                                                        06cv0629 J(RBB)

When deciding whether an evidentiary hearing is appropriate, the Court's first task is to determine whether Carapia failed to develop the factual basis for his claim in state court. Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005). "Under AEDPA, 'a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.'" Id. at 670 (quoting Williams v. Taylor, 529 U.S. 420, 432 (2000)).

If a petitioner developed the record in state court, the federal habeas court examines whether an evidentiary hearing is appropriate or required under Townsend v. Sain, 372 U.S. 293 (1963). There are six Townsend factors to consider:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Insyxiengmay, 403 F.3d at 670 (quoting Townsend, 372 U.S. at 313). When a Petitioner has developed the factual basis of his claim in state court and meets one of the Townsend factors, "'[a]n evidentiary hearing on a habeas corpus petition is required whenever petitioner's allegations, if proved, would entitle him to relief.'"   Id. (quoting Turner v. Marshall, 63 F.3d 807, 815 (9th Cir. 1995)).

If Carapia failed to develop the factual basis for his claim in state court, this Court is precluded from holding an evidentiary hearing unless he shows the claim relies on either:

> (i) a new rule of constitutional law, made
> retroactive to cases on collateral review by
> the Supreme Court, that was previously
> unavailable; or
>
> (ii) a factual predicate that could not have
> been previously discovered through the exercise
> of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to
> establish by clear and convincing evidence that but for
> constitutional error, no reasonable fact finder would
> have found the applicant guilty of the underlying
> offense.

28 U.S.C.A § 2254(e)(2)(A)-(B) (West 2006).  Even after satisfying section 2254(e)(2)(A)-(B), Petitioner must also "meet one of the Townsend factors and make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief." Insyxiengmay, 403 F.3d at 670.

Carapia takes no position on whether the facts underlying his claim were developed in state court. (See Traverse 2.)  Instead, he claims that he is "actually innocent" of the gang enhancement, California Penal Code section 186.22(b)(1).  (Traverse 2.)  Since he claims that insufficient evidence existed at trial to convict him of the gang enhancement, his claim necessarily relies on the facts presented during the trial, and so he must satisfy one of the six Townsend factors to be entitled to an evidentiary hearing. Insyxiengmay, 403 F.3d at 670.

After examining the six Townsend factors, none require that Carapia have an evidentiary hearing.  The merits of Petitioner's claim were resolved in the state court -- at both the trial and appellate levels.  As discussed above, the state court's finding that Carapia committed the crime with intent to further criminal gang activity is supported by the evidence presented at trial, and

27

the appellate court correctly affirmed his conviction.  Moreover, the fact-finding procedure employed was adequate to give Carapia a full and fair hearing; Petitioner has made no allegation of newly discovered evidence; the material facts were adequately developed in the state courts; and there is no indication that the state courts did not provide Carapia a full and fair hearing.

Petitioner does not satisfy any of the <u>Townsend</u> factors. Consequently, his request for an evidentiary hearing is **DENIED**.

**D.   Petitioner's Request for Appointment of Counsel Is Denied.**

In his prayer for relief in the Second Amended Petition, Carapia requests that the Court appoint counsel to represent him in litigating his Petition.  (Second Am. Pet. 9.)  The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners. <u>McCleskey v. Zant</u>, 499 U.S. 467, 495 (1991); <u>Bonin v. Vasquez</u>, 999 F.2d 425, 428 (9th Cir. 1993) (quoting <u>Chaney v. Lewis</u>, 801 F.2d 1191, 1196 (9th Cir. 1986)); <u>Knaubert v. Goldsmith</u>, 791 F.2d 722, 728 (9th Cir. 1986).  Nevertheless, financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation whenever the court "determines that the interests of justice so require."  18 U.S.C.A. § 3006A(a)(2) (West 2000 & Supp. 2005); <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176, 1181 (9th Cir. 1990).

The interests of justice require appointment of counsel when the Court conducts an evidentiary hearing on the petition or when the assistance of counsel is "necessary for effective discovery." 28 U.S.C.A. Rs. 6(a), 8(c) foll. § 2254 (West Supp. 2005); <u>Mayle v. Felix</u>, 545 U.S. 644, 675 (2005); <u>Terrovona</u>, 912 F.2d at 1177; <u>Knaubert</u>, 791 F.2d at 728.  Otherwise, the appointment of counsel

is discretionary.  Mayle, 545 U.S. at 675; <u>Terrovona</u>, 912 F.2d at 1177; <u>Knaubert</u>, 791 F.2d at 728.

Furthermore, "'[i]ndigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.'"  <u>Bonin v. Vasquez</u>, 999 F.2d at 428 (quoting <u>Chaney v. Lewis</u>, 801 F.2d 1191, 1196 (9th Cir. 1986)).  A due process violation may occur in the absence of counsel if the issues involved are too complex for the petitioner.  <u>Id.</u> at 428-29.

The Eighth Circuit has suggested the following factors should be considered when the court exercises its discretion to determine whether appointment of counsel is appropriate:  "the legal complexity of the case, the factual complexity of the case, and the petitioner's ability to investigate and present his claims, along with any other relevant factors."  <u>Hoggard v. Purkett</u>, 29 F.3d 469, 471 (8th Cir. 1994) (citations omitted).

These factors are useful in deciding whether due process requires the appointment of counsel.  First, the issues and facts that Carapia presents are not severely complex, and he adequately explained his claim for relief in his Second Amended Petition and his Traverse.  Further, Petitioner has adequately represented himself to date.  He filed his First Amended Petition with a Motion to Proceed In Forma Pauperis, a Motion for an Extension of Time, and a Motion for Stay and Abeyance [doc. nos. 9, 10, 11].  His Second Amended Petition and Traverse indicate that he understands the relevant law relating to his claim. (<u>See</u> Second Am. Pet.; Traverse.)  Petitioner asserts a claim of insufficient evidence,

which he exhausted on direct appeal to the California Court of Appeal, and nothing new or complex is added to his claim for habeas relief.

Under these circumstances, a district court does not abuse its discretion in denying a state prisoner's request for appointment of counsel as unwarranted. See LaMere v. Risley, 827 F.2d 622, 626 (9th Cir. 1987). At this stage of the proceedings, due process and the interests of justice do not require the appointment of counsel.

The assistance counsel provides is valuable. "An attorney may narrow the issues and elicit relevant information from his or her client. An attorney may highlight the record and present to the court a reasoned analysis of the controlling law." Knaubert, 791 F.2d at 729. As the court in Knaubert noted: "[U]nless an evidentiary hearing is held, an attorney's skill in developing and presenting new evidence is largely superfluous; the district court is entitled to rely on the state court record alone." Id. (citing Sumner v. Mata, 449 U.S. 539, 545-57 (1981), and 28 U.S.C. § 2254(d)). This Court, in denying Petitioner's request for appointment of counsel, notes that it has "review[ed] the record and render[ed] an independent legal conclusion." Id.

For the above-stated reasons, the "interests of justice" do not compel the appointment of counsel. Accordingly, Petitioner's request for appointment of counsel is **DENIED** without prejudice.

V.

**CONCLUSION**

For the above reasons, the district court should **DENY** Petitioner's Second Amended Petition for Writ of Habeas Corpus. In addition, Petitioner's request for an evidentiary hearing is

1  **DENIED**.   Petitioner's request for appointment of counsel is also

2  **DENIED**.

3       This Report and Recommendation will be submitted to the United

4  States District Court Judge assigned to this case, pursuant to the

5  provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

6  objections with the district court and serve a copy on all parties

7  on or before May 14, 2007.  The document should be captioned

8  "Objections to Report and Recommendation."  Any reply to the

9  objections shall be served and filed on or before May 30, 2007.

10 The parties are advised that failure to file objections within the

11 specified time may waive the right to appeal the district court's

12 order.  Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

13

14 DATED:  April 16, 2007

15                                        Ruben B. Brooks
                                          United States Magistrate Judge

16 cc:  Judge Jones
        All Parties of Record

17

18

19

20

21

22

23

24

25

26

27

28